1   WILLIAM L. SMITH
    Cal. State Bar No. 324235
2   ALEXANDRA M. WALSH (admitted *Pro Hac Vice*)
    DC State Bar No. 490484
3   HOLLY DOLEJSI (*Pro Hac Vice* forthcoming)
    MN State Bar No. 0390110
4   **ANAPOL WEISS**
    One Logan Square
5   130 North 18th Street, Suite 1600
    Philadelphia, PA 19103
6   Telephone: 202.780.3014
    Facsimile: 215-735-2211
7   Email: wsmith@anapolweiss.com
    Email: awalsh@anapolweiss.com
8   Email: hdolejsi@anapolweiss.com

9   *Additional Counsel in Signature Block*
    *Counsel for Plaintiffs*
10

11            **UNITED STATES DISTRICT COURT**
12        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
13              **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 14  IN RE: BABY FOOD PRODUCTS LIABILITY LITIGATION | Case No. 24-MD-3101-JSC |
| 15 | MDL 3101 |
| 16  This Document Relates To: | |
| 17  John Fouts, Individually and on Behalf of J.F., A MINOR, | Hon. Jacqueline Scott Corley |
| 18        *Plaintiff,* | **COMPLAINT AND JURY DEMAND** |
| 19  v. | **Case no.:** |
| 20 | |
| 21  Gerber Products Company; Nestlé Holdings, Inc. ("NHI"); Nestlé S.A. ("Nestlé"); Walmart, Inc.; and DOES 1 through 10 inclusive, | |
| 22 | |
| 23        *Defendants.* | |

24

25                    **INTRODUCTION**

26      1.      Defendants *knowingly* sold baby food products contaminated with lead, arsenic,

27  mercury, cadmium, and aluminum (collectively "Toxic Heavy Metals"). They did this knowing

28  that Toxic Heavy Metals, when consumed by babies, are known to cause brain damage and

                              - 1 -

1   neurodevelopmental harm.  Thus, to the extent Defendants sold baby food that contained
2   detectible amounts of Toxic Heavy Metals (collectively "Contaminated Baby Food") those
3   products were defective in their manufacture, design, and labeling.  Babies are the most
4   vulnerable segment of the population, and they rely on that food for healthy neurodevelopment.
5   Defendants justify this callous disregard for the welfare of babies because, until recently, there
6   were no regulations governing the presence of Toxic Heavy Metals in baby foods—and, because
7   there were no regulations, they were free to do as they pleased.

8       2.     This lawsuit aims to stop Defendants from poisoning infants with Contaminated
9   Baby Food.  Baby food *should* be safe.  It should *not* be contaminated with Toxic Heavy Metals.
10  Period.  By sourcing ingredients from farms that have non-detectable levels of heavy metal (using
11  sufficiently sensitive testing), avoiding certain ingredients all together, and systematically testing
12  and screening finished products for Toxic Heavy Metals *before* the foods are released for
13  consumption, these Defendants would be able to provide baby food products free of detectable
14  levels of Toxic Heavy Metals.  And, if some levels are truly unavoidable, or if Defendants believe
15  the identified levels are safe, then, at the very least, Defendants must warn
16  parents/guardians/caregivers about the presence of these Toxic Heavy Metals so they can make
17  informed decisions about what they are feeding their baby.  Anything short of proper design,
18  manufacture, and warning, is unacceptable—especially for an industry that touts itself as
19  providing the most important sources of neurodevelopment for the most vulnerable population of
20  society.

21      3.     Plaintiff, here, lives with brain injuries and neurodevelopmental harm caused by
22  exposure to the Defendants' Contaminated Baby Food, which has manifested in diagnoses of
23  Autism spectrum disorder ("ASD").  Plaintiff's parents were never warned that the Defendants'
24  food contained Toxic Heavy Metals and, thus, were never able to make an informed decision
25  about whether to feed their babies Defendants Contaminated Baby Foods.  The consequences are
26  stark—there is an unprecedented epidemic of ASD and ADHD spreading throughout the
27  American population, driven, in part, by the systematic neurodevelopmental poisoning of infants
28  from these Defendants' Contaminated Baby Foods.

4.      This case seeks to hold the Defendants accountable for their reprehensible conduct by compensating each Plaintiff harmed by the Defendants' Contaminated Baby Foods, and ensure each Defendant is punished to deter such conduct in the future.

PARTIES

**I.      Plaintiffs**

5.      Plaintiff is a child who lives with brain injuries and neurodevelopmental harm caused by exposure to the Defendants' Contaminated Baby Food, which has manifested in a diagnosis of ASD.

6.      Plaintiff alleges that as a direct and proximate result of Plaintiff's exposure to Toxic Heavy Metals from consumption of Defendants' Contaminated Baby Foods, they suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to, brain injury manifesting as the neurodevelopmental disorders ASD other permanent physical deficits, permanent bodily impairment, and other *sequelae*.  Plaintiff's injuries required medical intervention to address the adverse neurological effects and damage caused by exposure to Toxic Heavy Metals in Defendants' Contaminated Baby Foods. Additionally, Plaintiff has suffered severe mental and physical pain, including but not limited to, pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress and has and will sustain such injuries, along with economic loss due to medical expenses and living-related expenses as a result of lifestyle changes, into the future, as determined by the Trier of Fact.

7.      The product warnings for the Contaminated Baby Foods in effect during the time period Plaintiff consumed the Contaminated Baby Foods were non-existent, vague, incomplete and/or otherwise inadequate, both substantively and graphically, to alert consumers to the presence of Toxic Heavy Metals in the Contaminated Baby Foods and/or the potentially severe health risks associated with Toxic Heavy Metal exposure in babies.  Thus, each Defendant did not provide adequate warnings to consumers including Plaintiff, their parents, and the general public about the presence of Toxic Heavy Metals in the Contaminated Baby Foods consumed by Plaintiffs and the potential risk of the serious adverse events associated with Toxic Heavy Metal

- 3 -

1    exposure in infancy.

2         8.      Had Plaintiff or their parents been adequately warned by the Defendants of the

3    potential for exposure to Toxic Heavy Metals from consumption of Defendants' Baby Foods,

4    and/or the potential for such exposure to result in harm, Plaintiff, or parents would not have

5    purchased, used and/or consumed Contaminated Baby Foods or would have taken other steps to

6    potentially mitigate the harm caused by exposing a baby to Toxic Heavy Metals.

7    **II.      Defendants**

8         9.      The following are the Defendants listed in this Complaint.  In alphabetical order:

9              1.  Gerber Products Company ("Gerber")

10             2.  Nestlé Holdings, Inc. ("NHI")

11             3.  Nestlé S.A. ("Nestlé")

12             4.  Walmart, Inc. ("Walmart")

13        10.     Defendant Gerber Products Company ("Gerber") is a citizen of Michigan and

14   Virginia with its principal place of business located at 1812 N. Moore Street, Arlington, Virginia

15   22209.  Gerber sells Baby Foods under the brand name Gerber.  Gerber organizes its products

16   into broad categories of "formula," "baby cereal," "baby food," "snacks," "meals & sides,"

17   "beverages," and "organic."  At all relevant times, Gerber has conducted business and derived

18   substantial revenue from its manufacturing, labeling, advertising, distributing, selling, and

19   marketing of baby foods.  Gerber is a wholly owned subsidiary of and is directly controlled by

20   Nestlé Holdings, Inc.

21        11.     Defendant Nestlé Holdings, Inc. ("NHI") is a citizen of Delaware and Virginia

22   with its principal place of business located at 1812 N. Moore Street, Arlington, Virginia 22209.

23   According to its December 2023 annual report, "NHI is the holding company for Nestlé S.A.'s

24   principal operating subsidiaries in the United States, which include, among others, Nestlé USA,

25   Inc., Nestlé Purina Petcare Company, and Gerber Products Company."  NHI is a wholly owned

26   subsidiary of Nestlé S.A. ("Nestlé").  Thus, NHI is the holding company for Nestlé that directly

27   controls and operates Gerber—as noted by the sharing of the same address.  Indeed, nearly every

28   safety specialist that oversees the heavy metal content of Gerber baby foods, working currently

- 4 -

1   in the internal project "Metallica," are employed directly by NHI and/or Nestlé S.A.  At all

2   relevant times, NHI conducted business and derived substantial revenue through Gerber by

3   manufacturing, advertising, distributing, selling, and marketing baby foods within the judicial

4   districts involved in this litigation.

5        12.    Defendant Nestlé is a citizen of Switzerland, with its principal place of business

6   located at Avenue Nestlé 55, 1800 Vevey, Switzerland.  Nestlé is a global food and beverage

7   company with more than 2,000 brands.  Nestlé sells baby foods under its subsidiary, Gerber,

8   which it directly controls through its wholly owned subsidiary NHI.  Employees and scientists at

9   Nestlé trained and set safety standards at Gerber.  Indeed, in discovery ongoing in other litigation,

10  Gerber specifically identified scientists at Nestlé to testify on behalf of Gerber regarding the

11  safety of Gerber's baby food products.  Nestlé, thus, has been directly involved in the tortious

12  conduct in the United States and its various states that gives rise to these lawsuits.  At all relevant

13  times, Nestlé conducted business and derived substantial revenue through Gerber and/or NHI by

14  manufacturing, advertising, distributing, selling, and marketing baby foods within the judicial

15  districts involved in this litigation.

16       13.    The relationship between Gerber, NHI, and Nestlé was formed in 2007.  Prior to

17  that, starting in 1994, Gerber was owned and operated by Novartis, one of the largest

18  pharmaceutical companies in the world.  However, in 2007, Gerber was sold to Nestlé for $5.5

19  billion.

20       14.    For the purposes of this Complaint, unless specifically stated otherwise, NHI and

21  Nestlé shall be collectively referred to as "Nestlé." Further, allegations related to Gerber apply

22  equally to NHI and Nestlé, as each Defendant exercised authority and control over the sale,

23  manufacture, and distribution of Gerber's Contaminated Baby Foods at issue in this MDL.

24       15.    Defendant Walmart, Inc. ("Walmart") is a citizen of Delaware and Arkansas with

25  its principal place of business located at 702 S.W. 8th St. Bentonville, Arkansas 72716. Walmart

26  sells Baby Foods under the private label brand "Parent's Choice."  The foods are manufactured

27  by co-manufacturers, but are sold under Walmart's private label using Walmart's name.

28  Walmart's Parent's Choice offers a wide selection of baby foods ranging from "sweet potatoes &

- 5 -

1    corn" to "toddler cookies" and "yogurt bites".  At all relevant times, Walmart has conducted

2    business and derived substantial revenue from its manufacturing, advertising, distributing, selling,

3    and marketing of Baby Foods within this judicial district and throughout the United States.

4                                    **JURISDICTION AND VENUE**

5         16.    Plaintiff(s) file this Complaint pursuant to CMO No. 5, and are to be bound by the

6    rights, protections, and privileges, and obligations of that CMO and other Order of the Court.

7    Further, in accordance with CMO No. 5, Plaintiff(s) hereby designate the United States District

8    Court for the Western District of Kentucky, Louisville Division as Plaintiff's designated venue

9    ("Original Venue").  Plaintiff makes this selection based upon one (or more) of the following

10   factors (check the appropriate box(es))

11        _X_  Plaintiff currently resides in Louisville, Kentucky.

12        _X_  Plaintiff purchased and consumed Defendant(s) products in Kentucky.

13        ____The Original Venue is a judicial district in which Defendant _____ resides, and

14   all Defendants are residents of the State in which the district is located (28 U.S.C.

15   1391(b)(1)).

16        _X_  The Original Venue is a judicial district in which a substantial part of the events or

17   omissions giving rise to the claim occurred, specially (28 U.S.C. 1391 (b)(2)):

18        _____There is no district in which an action may otherwise be brought under 28 U.S.C.

19   1391, and the Original Venue is a judicial district in which Defendant _____ is subject to

20   the Court's personal jurisdiction with respect to this action (28 U.S.C. 1391 (b)(3)).

21        _____ Other reason (please explain): _____

22        17.    As an MDL transferee court, this Court has subject matter and personal

23   jurisdiction to the same extent as the respective transferee courts do.  In general, federal courts

24   have subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because Plaintiffs are

25   citizens of states other than states where Defendants are citizens.  In addition, Plaintiff seeks

26   damages in excess of $75,000, exclusive of interest and costs.

27        18.    This Court has personal jurisdiction over Defendants because their significant

28   contacts related to this litigation in each State make personal jurisdiction proper over any of them.

                                    - 6 -
                             COMPLAINT AND JURY DEMAND

**Commented [WS1]:** Remember that this is for federal court, so you should check what federal court district the plaintiff resides in. Kentucky has two districts: eastern and western. And I don't think there's a jefferson division for either of the kentucky federal districts. I think that's for state court.

19.     In particular, this Court has personal jurisdiction over Defendants for cases filed in this District insofar as Defendants are authorized and licensed to conduct business in the State of California, maintain and carry on systematic and continuous contacts in this judicial district, regularly transact business within this judicial district, and regularly avail themselves of the benefits of this judicial district.

20.     Additionally, Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

21.     Nestlé is subject to personal jurisdiction in the relevant judicial districts insofar as it is authorized and licensed to conduct business in their respective state.  Additionally, this Defendant maintains and carries on systematic and continuous contacts in these judicial districts, regularly transact business within these districts, and regularly avail themselves of the benefits of these districts.  This Defendant caused tortious injury by acts and omissions in these judicial districts and by acts and omissions outside these districts while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in these districts.

<strong>FACTUAL ALLEGATIONS</strong>

**I.      Rising Concerns Regarding the Presence of Toxic Heavy Metals in Baby Foods**

22.     In October 2019, an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF"), dedicated to designing and implementing "outcomes-based programs to measurably reduce babies' exposures to toxic chemicals," published a report investigating the presence of Toxic Heavy Metals in baby foods.  The HBBF Report tested 168 different baby foods sold on the U.S. market and concluded that "[n]inety-five percent of baby foods tested were contaminated with one or more of four toxic heavy metals—arsenic, lead, cadmium and mercury.  All but nine of 168 baby foods contained at least one metal; most contained more than one."  Specifically, the HBBF report identified "puffs and other snacks

- 7 -

made with rice flour," "[t]eething biscuits and rice rusks," "infant rice cereal," "apple, pear, grape and other fruit juices," and "carrots and sweet potatoes" manufactured by the Defendants as particularly high in Toxic Heavy Metals.

23.     The results of the HBBF report were consistent with that of the U.S. Food and Drug Administration ("FDA") which had, in 2017, detected one or more of the four Toxic Heavy Metals in 33 of 39 types of baby food tested.  However, the HBBF reported that "[f]or 88 percent of baby foods tested by HBBF—148 of 168 baby foods—FDA has failed to set enforceable limits or issue guidance on maximum safe amounts."  The HBBF's findings were by no means an outlier.  Eight months prior to publication of the HBBF report, a study conducted by scientists at the University of Miami and the Clean Label Project "examined lead…concentrations in a large convenience sample of US baby foods."  The study detected lead in 37% of samples.

24.     Moreover, earlier in 2017, HBBF commissioned a study to evaluate the presence of arsenic in infant rice cereal products sold in the U.S., and the potential risks to children's neurodevelopment posed by contamination levels.  The findings were concerning.  The authors concluded that "exposures to arsenic from infant rice cereal approach or exceed existing health-based limits for arsenic levels…leaving little room for additional exposures from other dietary sources, such as snacks, apple juice, and drinking water…Our analyses of arsenic exposures from infant rice cereal during the first year of life suggest that these exposures are not insignificant, and may place infants at risk for adverse health effects."

II.     **Congressional Investigation Finds Substantial Presence of Heavy Metals in Baby Foods Manufactured and/or Sold by Defendants, Sparking National Outrage**

25.     On February 4, 2021, and September 29, 2021, respectively, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published two reports detailing its findings that Toxic Heavy Metals—including lead, arsenic, mercury, and cadmium—were present in "significant levels" in numerous commercial Baby Food Products.  Four companies—Hain, Gerber (Nestlé), Nurture (Danone), and Beech-Nut—produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that

- 8 -

1  exceeded their internal testing limits.  Three companies—Plum (Campbell), Walmart, and

2  Sprout—initially refused to cooperate.

3      26.    Congress reported that the data submitted by the companies unequivocally

4  revealed that a substantial number of Defendants' finished products and/or ingredients used to

5  manufacture the Baby Foods are tainted with Toxic Heavy Metals, namely lead, arsenic, mercury,

6  and cadmium.  And, where the Defendants did set internal limits for the amount of metals they

7  allowed in their foods, Defendants routinely flouted their own limits and sold foods that

8  consistently tested above their limits.  Congress found the following:

9      27.    **Gerber.**  Gerber along with Nestlé used high-arsenic ingredients, using 67 batches

10  of rice flour that had tested over 90 ppb inorganic arsenic.  Nestlé and Gerber used ingredients

11  that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.  Nestlé

12  and Gerber rarely test for mercury in their baby foods.  In the September 2021 follow-up

13  Congressional report, it was revealed that Nestlé and Gerber's rice cereal tested up to 116 ppb

14  inorganic arsenic, and their average rice cereal product contained 87.43 ppb inorganic arsenic,

15  which is even higher than the amount contained in Beech-Nut's average rice cereal product.

16  While Beech-Nut recalled some of its products and completely discontinued sales of its rice

17  cereal, Nestlé and Gerber have taken no such actions to protect children.

18      28.    **Walmart**.  Walmart refused to cooperate with the House Subcommittee's

19  investigation into its baby foods products, and as such, the Subcommittee was "greatly

20  concerned" that Walmart "might be obscuring the presence of higher levels of toxic metals in

21  their baby food products." The Subcommittee noted that independent data from the HBBF Report

22  confirmed that Walmart's baby foods are indeed tainted. For example, the HBBF Report observed

23  that one of Walmart's products contained 56.1 ppb total arsenic, and 26.1 ppb cadium. Another

24  product contained 108 ppb total arsenic, 66 ppb inorganic arsenic, 26.9 ppb lead, and 2.05 ppb

25  mercury.

26      29.    Following the publication of the Subcommittee Report, Walmart provided

27  documents to the Subcommittee. On September 29, 2021, the House Subcommittee released a

28  subsequent report entitled "New Disclosures Show Dangerous Levels of Toxic Heavy Metals in

Even More Baby Foods." The Subcommittee report addendum described the documents from Walmart as "revealing a concerning lack of attention to toxic heavy metal levels in baby food and an abandonment of its previously more protective standards." Walmart does not appear to conduct any testing of its baby food products. Walmart sets maximum arsenic and lead levels and asks the manufacturer of its private label to self-certify, but Walmart does not appear to collect any test data or check the accuracy of those certifications. Walmart does not require any mercury or cadmium testing and does not set any standards for mercury or cadmium levels.

30.     The metal concentrations discussed above and further below surpass the limits allowed by U.S. regulatory agencies. There are no FDA final regulations governing the presence of Toxic Heavy Metals in the majority of Baby Foods with the exception of 100 ppb inorganic arsenic in infant rice cereal and proposed (not yet final) limits for lead in certain baby food categories. To the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendants' Baby Foods exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to *adult* exposure, not infants. Compared to these thresholds, the test results of the Defendants' baby foods and their ingredients are multiple folds greater than the permitted metal levels. Moreover, compounding these troubling findings, the Defendants set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards, as discussed below.

31.     As Congress observed, the Defendants have willfully sold—and continue to sell— contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products.

**III.     Defendants Engaged in a Pattern and Practice of Selling Contaminated Baby Foods and Failed to Reduce Metal Levels**

32.     Several factors drive the Toxic Heavy Metal contamination of Defendants' baby foods, all of which are within Defendants' control.

- 10 -

33.     *First*, at various times, all Defendants sourced ingredients that contained elevated levels of Toxic Heavy Metals.  These ingredients were then used to manufacture the baby foods consumed by Plaintiffs, thereby exposing Plaintiffs to Toxic Heavy Metals that cause brain damage and other neurodevelopmental harm.  One way for Defendants to "deal" with this issue involved relegating any testing of Toxic Heavy Metals to suppliers and co-manufacturers, who were required to certify that Toxic Heavy Metals were below a certain threshold.  Defendants would audit those results, discover that the reported certifications were false or inaccurate, and then take no action to stop the use of those ingredients or finished products.

34.     *Second*, some Defendants implemented dangerously high internal limits ("specifications" or "specs") for the maximum level of Toxic Heavy Metals that Defendants allowed in the baby foods.  Such high limits—untethered to any consideration of the low levels at which metals are capable of damaging babies' brains—allowed Defendants to source and use ingredients that contained elevated Toxic Heavy Metals to manufacture the baby foods consumed by Plaintiffs.  In the highly competitive and lucrative baby food market, using contaminated ingredients allows each Defendant to retain greater market share.

35.     *Third*, some Defendants failed to implement *any* internal specifications for the amount of Toxic Heavy Metals allowed in ingredients or finished baby foods.  By simply not looking at the issue, certain highly contaminated ingredients and finished products were allowed to be used and sold to consumers.  This would happen notwithstanding the Defendants' specific knowledge of the risk of Toxic Heavy Metals and their presence in ingredients and finished products.

36.     *Fourth,* Defendants did not routinely adhere to their own internal metal specifications or standards, allowing contaminated ingredients and finished products to be released as "exceptional releases" or other simpler terminology.  This resulted in ingredients being used and baby foods manufactured and sold that contained levels of Toxic Heavy Metals far higher than what was internally set by Defendants.  In other instances, Defendants would test products that had been put on the market after-the-fact, learn about the products containing extremely high levels of Toxic Heavy Metals, and then take no action to recall the product or

warn consumers about the issue.

37.   *Fifth*, upon information and belief, Defendants' manufacturing practices also contributed to contamination.  For example, the water used at some of the facilities where the baby foods were manufactured contained Toxic Heavy Metals which, in turn, ended up in the finished baby food product sold for consumption by babies.

**Commented [WS2]:** No, beech-nut in this case, right? So, I deleted it.

38.   **Gerber.**  Gerber, NHI, and Nestlé tested ingredients and, occasionally, finished products.  However, while Gerber, NHI, and Nestlé were the only Defendants to test both ingredients and finished products with any regularity, they set high heavy metal limits that rendered their food unsafe.  For baby foods generally, between 2012 and 2019, Gerber, NHI, and Nestlé set a limit of 40 ppb for lead, 20 ppb for arsenic, and 10 ppb for mercury.  For infant rice cereal, between 2012 and 2017, Gerber, NHI, and Nestlé set a lead limit of 100 ppb, with a "target" of 50 ppb in 2016 and 2017.  Between 2018 and 2019, Gerber, NHI, and Nestlé set a lead limit for 50 ppb.  For arsenic in rice cereal, between 2012 and 2015, Gerber, NHI, and Nestlé did not have a limit, merely a target of 100 ppb.  Then, between 2016 and 2018, it set the arsenic limit at 100 ppb.  By 2019, Gerber, NHI, and Nestlé increased the arsenic limit to 130 ppb for cereals with 90% rice (and kept the limit at 100 ppb for other cereals).  For snack foods, Gerber, NHI, and Nestlé had a lead limit of 150 ppb between 2012 and 2014. It was reduced to 100 ppb in 2016 and 2017, and then went down to 50 ppb in 2018 and 2019.  There was no limit for arsenic in snack food prior 2016, just a "target" of 100 ppb.  Then a 100-ppb arsenic limit was set starting in 2016.  For both infant cereal and snacks, Gerber, NHI, and Nestlé imposed a 30-ppb limit for mercury in infant cereal between 2012 and 2016, and reduced it to 10 ppb from 2017 onward. With these exceptionally high limits, Gerber, NHI, and Nestlé sold baby foods that were dangerous for infant consumption.  They did this knowingly.

39.   Gerber, NHI, and Nestlé would also audit and re-test Toxic Heavy Metal results submitted by suppliers, and find that the certification from suppliers were incorrect or false. Gerber, NHI, and Nestlé would nonetheless use the certified results and release products despite the ingredients not meeting specifications or being safe for infant consumption.

40.   Gerber, NHI, and Nestlé often used high-arsenic ingredients, for example, using

- 12 -

1   67 batches of rice flour that had tested over 90 ppb inorganic arsenic.  Furthermore, Gerber, NHI,

2   and Nestlé regularly sold baby food products testing over 100 ppb arsenic, at times reaching 116

3   ppb, and their average rice cereal product contained 87.43 ppb inorganic arsenic.  Indeed, this is

4   why Congress noted that "Gerber's organic rice cereal is dangerous…"  In other instances, Gerber

5   permitted as much as 300 ppb of arsenic in the rice flour ingredient used to manufacture its U.S.

6   baby foods, notwithstanding the fact that Gerber often implemented stricter standards for baby

7   foods sold in other countries.

8       41.    Gerber's baby foods are also contaminated with elevated levels of lead.  Gerber,

9   NHI, and Nestlé used ingredients that tested as high as 48 ppb lead and used many ingredients

10  containing over 20 ppb lead.  Furthermore, Gerber, NHI, and Nestlé sold baby food products

11  testing at and/or above 50 ppb of lead.   Indeed, Gerber, NHI, and Nestlé have historically

12  permitted as much as 150 ppb lead in their baby food products.  Although Gerber, NHI, and Nestlé

13  were fully aware that it was very feasible to source lower-lead ingredients, they proceeded to use

14  high-lead ingredients in their baby foods.  Gerber, NHI, and Nestlé rarely test for mercury in their

15  baby foods. This is notwithstanding the fact that mercury is known to contaminate ingredients

16  such as rice and poses a severe risk to babies' brain development.

17      42.    The February 4, 2021 Congressional Report found Gerber carrots tested for

18  cadmium at levels above 5 ppb, with some containing more than 87 ppb of cadmium.  These are

19  exceptionally high levels.

20      43.    Moreover, compounding these troubling findings, Gerber, NHI, and Nestlé

21  historically only tested certain ingredients of its baby food products and only occasionally tested

22  the finished products consumed by babies.  It was not until recently that Gerber, NHI, and Nestlé

23  started to implement finished product testing on a more regular basis.

24      44.    Gerber, NHI, and Nestlé have known since at least the 1990s that inorganic arsenic

25  was neurotoxic and caused developmental issues.  Despite this knowledge, in 2012, when

26  Gerber's infant rice cereal was on the front page of a Consumer Report article on arsenic, a Gerber

27  spokesperson told the public that arsenic in baby food posed no health risk.

28      45.    **Walmart.** Walmart sold baby food under a "private" brand called "Parent's

Choice", which was manufactured by a different supplier but branded, promoted, and sold as a Walmart product. Walmart did not test it for Toxic Heavy Metals whatsoever.  Instead, Walmart required certain specifications be met for the products provided by its suppliers, which included some limits of heavy metals.  These specifications were not enforced in any way.  Walmart did not require the submission of testing from suppliers, nor did it do any of its own testing.

46.     The only efforts to police Toxic Heavy Metals in their Parent's Choice baby food involved generic specifications for lead and arsenic—there were no other specifications or limits for other Toxic Heavy Metals—which for most baby food products resulted in there being no limits. The following chart reflects Walmart's Toxic Heavy Metal specifications prior to December 2018.

| Type of Food | Lead | Arsenic | Mercury | Cadmium | Aluminum |
|---|---|---|---|---|---|
| Dry baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Dry baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Wet baby food with no juice or nectar | *None* | *None* | *None* | *None* | *None* |
| Wet baby food with juice or nectar | 50 ppb | 23 ppb | *None* | *None* | *None* |
| Yogurt baby food products | *None* | *None* | *None* | *None* | *None* |

47.     In December 2018, Walmart changed its specification to 100 ppb of inorganic arsenic for all dry baby foods, making the products even less safe.  Thus, for the vast majority of Walmart's baby food products, there was never a limit for any Toxic Heavy Metals.

**IV.     Defendants Abandon Efforts to Reduce Metal Levels in Baby Foods**

48.     In 2019, as concerns grew over contamination of certain baby foods on the U.S. market, a consortium of the Defendants comprised of Beech-Nut, Plum/Campbell, Gerber, Hain, Nurture, and Sprout, as well as certain interested third party groups such as the Environmental Defense Fund ("EDF") and HBBF, were formed with the intention "of reducing heavy metals in young children's food."

49.     The consortium was named the Baby Food Council ("BFC").  The BFC involved the sharing of common testing data on the levels of metal contamination of Defendants' baby foods, a grant to Cornell University to further study the issue, and a proposed "voluntary Baby Food Standard to limit the amounts of heavy metals in baby food."  The BFC specifically

- 14 -

1 recognized the risk of neurodevelopmental harm caused by Toxic Heavy Metals to the developing

2 brain of infants and that there were no safe levels of exposure.

3     50.    The Baby Food Standard "would have provided companies with a common

4 framework for progressively reducing contaminants by regularly testing products and improving

5 management practices, and for being transparent with consumers about the safety of their

6 products."

7     51.    After several years of negotiations and discussions, including a proposed system

8 for testing, the EDF and HBBF proposed voluntary limits of 1 ppb for lead.  The baby food

9 companies, however, rejected the proposal outright.  Participation in the BFC was little more than

10 a façade—they had no intention of self-regulating their products as it related to Toxic Heavy

11 Metals.

12     52.    This led EDF and HBBF to leave the BFC in protest in 2021.  They explained their

13 departure publicly, noting that Defendants "all decided to backpedal on this project—even though

14 the standard was designed to protect babies' brain development" and provide adequate notice to

15 consumers regarding the presence of Toxic Heavy Metals on Baby Food labeling.   EDF

16 explained:

> EDF cofounded the Council because we believed there was a shared commitment
> to reduce levels of lead, arsenic and cadmium in baby food products to better protect
> children's developing brains from these toxins … Unfortunately, the companies
> chose to cease the Council's development of a voluntary Baby Food Standard that
> it had begun in late 2020. The Standard would have provided companies with a
> common framework for progressively reducing contaminants by regularly testing
> products and improving management practices, and for being transparent with
> consumers about the safety of their products. Negotiations failed to provide an
> alternative approach that EDF felt was sufficient to drive down levels of lead,
> arsenic and cadmium in baby food."

23     53.    HBBF explained:

> Healthy Babies Bright Futures is focused on tangibly reducing neurotoxic
> exposures to babies.  The baby food companies' refusal to jointly set limits for
> heavy metals in baby food has shown that the Council will no longer be the
> powerful mechanism for this important work that the initial plans had promised.
> The baby food companies' decision to stop progress on a voluntary standard for
> heavy metals in baby food is a disappointment … What started as dedication has
> turned into delay and intention has become inaction.  So HBBF has decided to put
> our effort into other initiatives that will move the needle on this important issue.

28     54.    In short, the Defendants opted to continue "self-regulating," the same self-

regulation which exposed—and continued to expose—Plaintiffs to Toxic Heavy Metals in Defendants' baby foods.

**V.     The Dangers of Toxic Heavy Metals and Metal Exposure Through Consumption of Baby Foods**

55.     According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically lead, arsenic, mercury, and cadmium pose a "major public health concern" for children.  The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard."  Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number *one* among substances present in the environment that pose the most significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).

56.     The threat presented by Toxic Heavy Metals to children's health is widely shared by the global regulatory and scientific community.  For example, the FDA has set an Interim Reference Level ("IRL") of 2.2 micrograms/day for lead exposure through baby food products.  That is the amount of lead exposure at or above which the agency considers associated with adverse neurodevelopmental effects in babies.  The FDA, in its guidance documents for inorganic arsenic and lead in baby food products has repeatedly acknowledged the dangers of heavy metals to the neurodevelopment of infants.

Even low lead exposure can harm children's health and development, specifically the brain and nervous system. Neurological effects of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Lead exposures also may be associated with immunological, cardiovascular, renal, and reproductive and/or developmental effects…Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time…Even though no safe level of lead exposure has yet been identified for children's health, the IRL serves as a useful benchmark in evaluating the potential for adverse effects of dietary lead. In particular, FDA is focused on the potential for neurodevelopmental effects from lead exposure, as review of the scientific literature indicates that *such adverse effects of lead consistently occur at a blood lead level associated with FDA's IRL for children*. (emphasis added).

57.     As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful

- 16 -

1    consequences on children health include mental retardation, neurocognitive disorders, behavioral

2    disorders, respiratory problems, cancer and cardiovascular diseases.  Much attention should be

3    given to heavy metals because of their high toxicity potential, widespread use, and prevalence."

4    Children and, even more so, babies have higher exposure to metals compared to adults because

5    they consume more food in relation to their body weight and absorb metals more readily than

6    adults by 40 to 90%.

7         58.    The  mechanisms  needed  to  metabolize  and  eliminate  heavy  metals  are

8    comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms

9    and  poorer  immune  systems  than  adults.  For  example,  liver  pathways  that  in  adulthood

10   metabolize  absorbed  arsenic  do  not  mature  until  mid-childhood;  un-excreted  arsenic  thus

11   continues to circulate and is deposited in other organs.  According to Linda McCauley, Dean of

12   the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental

13   health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in

14   vulnerable infants."

15        59.    Thus, "the major windows of developmental vulnerability occur during infancy

16   and  early  childhood  due  to  continuing  brain  development  after  birth."  In  short,  even  small

17   amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and

18   children.

19   **VI.    Exposure  to  Toxic  Heavy  Metals  Has  Been  Consistently  Associated  with**

20   **Neurodevelopmental Harm, i.e., Autism and ADHD in Pediatric Populations**

21        60.    It is well-known that exposure to Toxic Heavy Metals in early life can interfere

22   with neurodevelopment at exceedingly low levels of exposure.  And, one of the ways in which

23   such  interference  with  neurodevelopment  can  present  in  a  child  is  in  the  form  of  the

24   neurodevelopmental disorders ASD and ADHD.  As the U.S. Centers for Disease Control

25   observed in its 2020 Toxicological Profile for Lead, at just ≤10 μg/dL: "The following

26   neurobehavioral  effects  in  children  have  been  associated  with  [lead]:  "Altered  mood  and

27   behaviors that may contribute to learning deficits, including *attention deficits, hyperactivity*,

28   *autistic behaviors*, conduct disorders, and delinquency." (emphasis added).  Likewise, the NIH

- 17 -

states: "prenatal and early childhood exposure to heavy metals…may be linked to autism spectrum disorder."

61.    Such conclusions have likewise been reached by a consortium of the country's leading epidemiologists, pediatricians, and medical groups, noting that Toxic Heavy Metals such as lead and mercury are "prime examples of toxic chemicals that can contribute to learning, behavioral, or intellectual impairment, as well as specific neurodevelopmental disorders such as ADHD or autism spectrum disorder."

62.    Multiple studies, reviews, and meta-analyses conducted throughout various parts of the world over the last decade have consistently observed that early life exposure to heavy metals can cause brain injury and, specifically, brain injury which manifests as ASD.

63.    For example, four meta-analyses published in 2014, 2017, 2019 and 2020, respectively, observed consistent associations between exposure to arsenic, cadmium, and mercury and ASD in children; with the authors in all three studies recommending – based on the data – that exposure to such metals in children be reduced as much as possible, and one of the study authors specifically concluding that "Results of the current meta-analysis revealed that mercury is an important causal factor in the etiology of ASD."

64.    In a recent 2017 NIH-funded prospective observational study, the authors examined the risk of ASD outcome in twins based on their respective body burden of lead.  The study concluded in no uncertain terms that "prenatal and early childhood disruption (excess or deficiency) of multiple metals during critical developmental windows is associated with ASD, and suggests a role for elemental dysregulation in the etiology of ASD."

65.    Similarly, a large, prospective study from 2016 in Korean school children observed that low levels of lead exposure in early life are associated with autism, the authors specifically concluding: "even low blood lead concentrations…are associated with more autistic behaviors… underscoring the need for continued efforts to reduce lead exposure."

66.    Studies have repeatedly observed strong associations between exposure to cadmium and aluminum and neurodevelopmental disorders such as ASD, as observed by a recent study: "Environmental exposure to…cadmium (Cd)… and aluminum (Al) has been associated

- 18 -

with neurodevelopmental disorders including autism spectrum disorder (ASD)."  For example, a study from 2014 evaluated the body burden of lead, cadmium, and arsenic in children with autism compared to controls and noted that, in addition to lead and arsenic, "our study demonstrated elevation in the levels of…cadmium…in a child with autism," while an earlier study noted that "autism may be associated with significant alterations of some rare element concentrations, including Cd…"  Such results have been confirmed by meta-analyses which "show *significant associations* between ASD and the metals Al [and[ Cd."   And, such earlier data is further supported by recent research, with a 2023 systematic review and meta-analysis concluding that "compared with the healthy control group, the ASD group had higher concentrations of Cd, Pb, arsenic, and Hg. These 4 heavy metals play different roles in the occurrence and progression of ASD."

67.    Repeated associations between early life Toxic Heavy Metal exposure and ASD have also been observed during the pre-natal timeframe, lending further strength to the findings of post-natal studies.  For example, in a 2021 study by Skogheim and colleagues, the authors prospectively assessed the relationship between pre-natal metal exposure in various biomarkers and autism risk.  The study concluded that "[r]esults from the present study show several associations between levels of metals and elements during gestation and ASD and ADHD in children. The most notable ones involved arsenic…mercury…and lead. Our results suggest that even population levels of these compounds may have negative impacts on neurodevelopment."

68.    Similarly, in a study by the research group assessing the New Hampshire Birth Cohort, the authors evaluated the neurotoxic effects of heavy metals during various stages of pregnancy and concluded: "Our results support the hypothesis that exposure to…As in mid to late pregnancy may be neurodevelopmentally harmful."

69.    Such results have been replicated in studies throughout the world, including China, Korea, the U.S., Europe, and Egypt, implicating arsenic, mercury, and lead in pediatric diagnoses of autism and autistic behaviors, with a 2018 Chinese study concluding: "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy metal exposure, particularly mercury, in the etiology of ASD."  Indeed, a 2015 Egyptian study noted

- 19 -

1  "[e]nvironmental exposure to these toxic heavy metals, *at key times in development*, may play a

2  ***causal*** role in autism." (emphasis added).

3      70.     Exposure to Toxic Heavy Metals, specifically lead, has also been repeatedly

4  associated with the development of ADHD in children, as demonstrated by numerous studies.

5      71.     No fewer than four large meta-analyses, conducted in four different continents

6  (North America, South America, Europe and Asia), and some employing a cross-sectional design,

7  have observed a consistent association between various metals and ADHD in children.  Indeed,

8  the authors of the meta-analysis from Spain noted that "the evidence from the studies allowed us

9  to establish that there is an association between lead and ADHD and that even *low levels of lead*

10  *raise the risk.*" (emphasis added).

11      72.     The findings from the meta-analyses have been replicated in several Chinese

12  studies from 2006, 2014, and 2018, respectively.  Notably, the authors of the 2014 Chinese study

13  observed that "[e]xposure to lead even at low levels correlates with attention-deficit/hyperactivity

14  disorder (ADHD). However, lead-contaminated environments are often *contaminated with other*

15  *heavy metals that could exacerbate lead-induced ADHD.*" (emphasis added).   This is particularly

16  relevant—and disturbing—as children who consumed Defendants' baby foods were repeatedly

17  exposed to a cocktail of Toxic Heavy Metals that, synergistically, further increased their risk of

18  developing ADHD.

19      73.     Moreover, studies have observed a dose-response relationship between exposure

20  to Toxic Heavy Metals and ADHD, as demonstrated by the 2016 Spanish study Donzelli, *et al.*

21  Another 2016 cross-sectional study from Spain was conducted on 261 children aged 6-9 to

22  examine the association between exposure to arsenic and ADHD.  After adjusting for potential

23  confounders, the authors observed a dose-response relationship between urine arsenic levels and

24  inattention and impulsivity scores, concluding that "[urine arsenic] levels were associated with

25  impaired attention/cognitive function, *even at levels considered safe*.   These results provide

26  additional evidence that postnatal arsenic exposure impairs neurological function in children."

27  (emphasis added).

28      74.     The fact that such results, and many more, have been observed in multiple studies,

- 20 -

1    conducted by different researchers, at different times, in different parts of the world, in children

2    of multiple ages, utilizing different study methods (prospective, case-control and cross-sectional

3    epidemiological analyses) and measuring a variety of end-points (including hair, blood, and

4    urine), strongly supports a causal relationship between exposure to Toxic Heavy Metals and the

5    development of ASD and ADHD in children.

6    **VII.    Defendants' Baby Foods Contain Toxic Heavy Metals Capable of Interfering with**

7    **Early Neurodevelopment**

8        75.    As illustrated above, Toxic Heavy Metal exposure is capable of inflicting damage

9    to the developing brain at extremely low doses.  And, upon information and belief, Defendants

10   manufactured and sold baby foods containing Toxic Heavy Metals that can, under certain

11   circumstances (based upon the genetic susceptibilities, medical history, and other factors of the

12   exposed child) interfere with a baby's neurodevelopment sufficient to cause conditions such as

13   ASD and ADHD.

14       76.    As an initial matter, the study commissioned by HBBF and discussed above

15   specifically evaluated the propensity for arsenic exposure through consumption of infant rice

16   cereal to impact early life neurodevelopment.  Following analyses of the levels of arsenic

17   exposure from consumption of infant rice cereal, the authors concluded "that high consumers of

18   infant rice cereal (i.e., infants eating three servings per day) eating products currently on the U.S.

19   market would have a daily arsenic intake of 0.35-0.67 µg/kg bw/day…per the Tsuji et al. (2015)

20   lower-bound estimate for an RfD for the neurodevelopmental effects of arsenic (0.4 µg/kg

21   bw/day), high consumers of infant rice cereal may also be at risk for this endpoint.  Even in

22   average consumers of infant rice cereal (i.e., one serving per day), our estimates of arsenic intakes

23   (0.15 to 0.29 µg/kg bw/day) leave little room for exposures to arsenic from other sources."  Thus,

24   consumption of Defendants' baby foods, including but not limited to infant rice cereal and rice-

25   based snack baby food products manufactured and sold by Defendants can expose babies to levels

26   of arsenic above that associated with neurodevelopmental harm in the scientific literature.

27       77.    Defendants manufactured and sold baby food products that, with just a couple of

28   servings, are capable of exposing a baby to lead levels at or above the 2.2 ug/day considered by

- 21 -

1  the FDA to be associated with neurodevelopmental harm.  Each source of lead exposure is

2  cumulative—making any detectable amount of Toxic Heavy Metal in baby food a contributing

3  factor to potential neurodevelopmental harm.

4       78.    Similarly, upon information and belief, Defendant Hain was aware of the

5  neurotoxic propensities of lead, arsenic, and mercury at low levels, but proceeded to manufacture

6  and sell Baby Foods containing arsenic and lead levels that, upon information and belief, Hain

7  considered as capable of inflicting neurodevelopmental harm.

8  **VIII.  Defendants Knowingly Sold Baby Foods Containing Toxic Heavy Metals and Knew**

9        **or Should Have Known of the Risks of Such Exposures in Children and Thus**

10        **Breeched their Duty of Care in Selling Contaminated Baby Foods**

11       79.    During the time that Defendants manufactured and sold baby foods in the United

12  States, the weight of evidence showed that Defendants' baby foods exposed babies and children

13  to Toxic Heavy Metals.  Defendants failed to disclose this risk to consumers through any means.

14       80.    As discussed above, both independent testing, the Defendants' internal evaluations

15  of their baby foods, and the Defendants' representations and disclosures to Congress and the FDA

16  reveal the presence of Toxic Heavy Metals in Defendants' products.  As such, Defendants knew

17  or should have known that their baby foods contain Toxic Heavy Metals with an attendant risk of

18  causing neurodevelopmental harm.

19       81.    Indeed, independent testing performed in early 2019 demonstrated elevated

20  amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market, and the HBBF

21  Report further confirmed such contamination of Defendants' baby foods.  And, as the

22  Congressional investigation found, the Defendants continued to sell their baby foods even after

23  testing of both ingredients and finished products revealed the presence of Toxic Heavy Metals.

24       82.    Moreover, the scientific literature on the dangers of Toxic Heavy Metals—

25  particularly as it relates to adverse effects on the neurodevelopment of children—have been well

26  known for decades.  Defendants, as manufacturers and sellers of baby foods, are held to the

27  standard of experts and responsible for keeping abreast of the latest scientific developments

28  related are held to the dangers of contaminants in their products.  Defendants failed to take action

1    to protect vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus,

2    subjected them to the risk of brain injury which can manifest as neurodevelopmental disorders

3    such as ASD, ADHD, and related *sequalae*.

4        83.    To be clear, the Defendants are able to manufacture baby foods that do not pose

5    such a dangerous risk to the health of infants and children by using alternative ingredients, not

6    adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals or sampling their

7    ingredients from other sources.  At the very least, Defendants were under a duty to warn

8    unsuspecting parents of the presence of Toxic Heavy Metals in their Baby Foods.

9    IX.    **Defendants' Baby Food Products Were Defective Due to Insufficient Warnings,**

10           **Manufacturing Defects, and/or Design Defects to the Extent the Baby Food Products**

11           **Contained Detectable Levels of Toxic Heavy Metal**

12       84.    All of Defendants' baby food products that contained detectable levels of Toxic

13   Heavy Metals (or constituted finished products wherein the ingredients contained detectable

14   levels of Toxic Heavy Metals), assuming state of the art analytical testing, were defective as it

15   relates to warnings because no Defendant has ever warned about the presence of Toxic Heavy

16   Metals in their baby foods.  Because discovery is ongoing, a complete list of Defendants' specific

17   baby foods that contained detectable levels of Toxic Heavy Metals is not known at this time.

18   Based on publicly available testing data, including data reported by HBBF and Congress, the vast

19   majority of Defendants' products contain detectable levels of Toxic Heavy Metals in them,

20   rendering them each defective as it relates to warnings.  Attached as Appendix A to this Complaint

21   is a list of the Defendants' products now known to be defective.  This list, however, is not

22   comprehensive and shall be amended as discovery is obtained.

23       85.    Defendants' baby food products are also defective as manufactured, as they

24   contain detectable Toxic Heavy Metals which are not supposed to be there, by design.  Toxic

25   Heavy Metals do not provide any nutritional or therapeutic value to infants or fully-grown

26   humans.  They are only poisonous to neurodevelopment.  None of these baby food products, by

27   design, should contain Toxic Heavy Metals in them and, thus, to the extent the products contain

28   detectable levels of Toxic Heavy Metals in them, those are manufacturing defects.  Based on

publicly available data, most of Defendants' baby food products contain some detectable levels of Toxic Heavy Metals in them.  However, as the levels of Defendants' baby food products are not known yet, nor do Plaintiffs have a complete list of Defendants' baby food products or their formulations—information that will be obtained through discovery—Plaintiffs cannot identify each baby food product that contained a manufacturing defect.  However, Appendix A is a running list of baby food products sold by Defendants.

86.    If Defendants specifically designed their baby food products to contain Toxic Heavy Metals, meaning their presence was not the product of a manufacturing defect, then the products were defective by design.  Toxic Heavy Metals should not be present in foods that are being consumed by infants and products should be designed to not have detectable levels of toxic heavy metal in them.  Such designs are easily accomplished, by only using ingredients that contain non-detectable levels of Toxic Heavy Metals and by testing finished products, before release, to ensure they do not contain Toxic Heavy Metals within them.  This is possible because there are examples of Defendants' finished products not containing detectable levels of Toxic Heavy Metals—even if, for that same products, there are instances where they did.  Thus, Defendants were able to design baby food products to not contain detectable levels of toxic heavy metals, and to the extent that each Defendants' design contemplated there being detectable levels of Toxic Heavy Metals in baby food, the design, itself, was defective.  Because Plaintiffs do not know the Defendants' intended design for their baby food products—as there has been no discovery obtained to date concerning product formulation, product/ingredient specifications, and testing methodologies/capabilities—Plaintiffs cannot specify which baby food products were defectively designed versus which ones were not.  That said, Appendix A, a running list of the Defendants' baby food products that, with further discovery, may yield information that will allow Plaintiffs to identify whether the product was defectively designed.

87.    Whether the Defendants' products were defective due to inadequate warnings, manufacturing errors, or by design, the existing publicly available evidence indicates that consumption of Defendants' baby food products can expose infants to Toxic Heavy Metals, and that depending on specific milieu of products consumed by each Plaintiff and each Plaintiff's

- 24 -

specific susceptibility and circumstances, Defendants' baby food products contributed to each Plaintiff's Toxic Heavy Metal burden during critical period of infant neurodevelopment. Each Plaintiff, thus, alleges that this cumulative exposure from Defendants' products to Toxic Heavy Metals, substantially contributed to causing neurodevelopmental harm that manifested as ASD and/or ADHD. Moreover, each Plaintiff alleges that had these baby food products not been defective—by having sufficient warnings, being correctly manufactured, and/or designed properly—each Plaintiff would not have been exposed to levels of Toxic Heavy Metals in Defendants' baby food products that would have contributed to the neurodevelopmental harm that manifested as ASD and/or ADHD.

**X.      Exemplary / Punitive Damages Allegations**

88.      Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants' conduct is particularly reprehensible given that their toxic foods were directed at vulnerable babies—a population group far more susceptible than adults to the neurotoxic dangers of heavy metals.

89.      Defendants were fully aware of the safety risks of Contaminated Baby Foods, particularly the dangerous potential of Toxic Heavy Metals on neurodevelopment in infants and children. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers. Indeed, Defendants repeatedly market their baby foods as safe for consumption and go so far as claiming that they adhere to "the strictest standards in the world;" and provide "baby's food full of nutrition while meeting standards strict enough for tiny tummies," as well as other statements and representations that hold out their baby foods as safe for consumption by infants. Indeed, each Defendant falsely reassured parents/guardians/caregivers that their baby foods would foster healthy neurodevelopment when consumed even though they knew their baby foods exposed infants' developing brains to potent neurotoxic heavy metals. In actual fact, as discussed above, Defendants routinely sold Contaminated Baby Foods, regularly flouted their own internal limits of Toxic Heavy Metals and failed to disclose to consumers that their products contained such dangerous contaminants.

90.      This was not done by accident or through some justifiable negligence. Rather,

- 25 -

1    Defendants knew they could profit by convincing consumers that their baby foods were heathy

2    and safe for infants, and that full disclosure of presence and/or risks of the Toxic Heavy Metals

3    present in the baby foods would limit the amount of money Defendants would make selling the

4    products.  Defendants' object was accomplished not only through a misleading label, but through

5    a comprehensive scheme of selective misleading research and testing, failure to test, false

6    advertising, and deceptive omissions as more fully alleged throughout this Complaint.

7    Parents/guardians/caregivers were denied the right to make an informed decision about whether

8    to purchase Defendants' baby food for their babies without knowing the full risks attendant to

9    that use. Such conduct was done with conscious disregard of Plaintiffs' welfare and rights.

10                                **PLAINTIFF-SPECIFIC ALLEGATIONS**

11          91.     Plaintiff was diagnosed with ASD at approximately 11 years of age.

12          92.     Plaintiff started consuming Baby Food products manufactured and/or sold by the

13   Defendants in approximately 2011 and consumed Defendants' Baby Food products at various

14   times through early childhood.

15          93.     Upon information and belief, the Baby Food products manufactured/marketed by

16   Defendants and consumed by Plaintiff were all contaminated with substantial quantities of Toxic

17   Heavy Metals.

18          94.      Upon information and belief, as a direct and proximate result of consuming

19   Defendants' Baby Foods, Plaintiff was exposed to substantial quantities of Toxic Heavy Metals.

20          95.     As a direct and proximate result of consuming Defendants' Baby Foods and the

21   exposure to the Toxic Heavy Metals therein – Plaintiff suffered brain injury which manifested as

22   ASD and related *sequalae.*

23          96.     Based on prevailing scientific evidence, exposure to the Toxic Heavy Metals at

24   the levels contained in Defendants' Baby Foods can cause brain injury which can manifest as the

25   neurodevelopmental disorders ASD and related *sequalae* in humans.

26          97.     Had any Defendant warned Plaintiff's parents that Defendants' Baby Foods could

27   lead to exposure to Toxic Heavy Metals or, in turn, brain injury, Plaintiff would not have

28   consumed the Baby Foods.

                                        - 26 -

98.     Plaintiff alleges that as a direct and proximate result of Plaintiff's consumption of Baby Foods supplied and distributed by Defendants, Plaintiff suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to brain injury which manifested as ASD and related *sequelae*.

## CAUSES OF ACTION

### COUNT I:  STRICT PRODUCTS LIABILITY – FAILURE TO WARN

99.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

100.    At all relevant times, Defendants engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting baby foods, which are defective and unreasonably dangerous to consumers, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of baby foods in the form of the presence of Toxic Heavy Metals.  These actions were under the ultimate control and supervision of Defendants.  At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold baby foods and aimed at a consumer market.

101.    Defendants researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Contaminated Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn about the presence of and risks associated with exposure to Toxic Heavy Metals from the consumption of Contaminated Baby Foods.

102.    At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiff of dangers associated with exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods.   Defendants, as a

- 27 -

manufacturer, seller, or distributor of food, are held to the knowledge of an expert in the field.

103.    At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of exposure to Toxic Heavy Metals in the Contaminated Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such toxins.

104.    At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by exposure to the Toxic Heavy Metals in Defendants' Baby Foods.

105.    Even though Defendants knew or should have known that the presence of Toxic Heavy Metals in Contaminated Baby Foods posed a risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The neurotoxic characteristic of Toxic Heavy Metals contained in Defendants' Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as Plaintiff.  The product warnings for Contaminated Baby Foods in effect during the time period Plaintiff consumed those foods were inadequate, both substantively and graphically, to alert consumers to the presence of and health risks associated with exposure to the Toxic Heavy Metals from Contaminated Baby Food consumption.

106.    At all relevant times, Defendants' Contaminated Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiff, without substantial change in their condition as manufactured, sold, distributed, labeled, and marketed by Defendants.

107.    Plaintiff was exposed to the Toxic Heavy Metals in Defendants' Contaminated Baby Foods without knowledge of the potential for such exposure to Toxic Heavy Metals from consumption of the products and the dangerous characteristics of the toxins.

108.    At all relevant times, Plaintiff was exposed to the Toxic Heavy Metals in the

- 28 -

1    Defendants' Contaminated Baby Foods while consuming the foods for their intended or

2    reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

3        109.    Plaintiff could not have reasonably discovered the defects and risks associated

4    with exposure to the Toxic Heavy Metals in the Contaminated Baby Foods prior to or at the time

5    of Plaintiff consuming those foods.  Plaintiff relied upon the skill, superior knowledge, and

6    judgment of Defendants to know about and disclose serious health risks associated with exposure

7    to the toxins in Defendants' products.

8        110.    The information that Defendants did provide or communicate failed to contain

9    relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs

10   to avoid consuming the products and, in turn, exposure to the Toxic Heavy Metals.  Instead,

11   Defendants disseminated information that was inaccurate, false, and misleading, and which failed

12   to communicate accurately or adequately the comparative severity, duration, and extent of the

13   risk of injuries with use of and/or exposure to the Toxic Heavy Metals in the Contaminated Baby

14   Foods; continued to aggressively promote the safety of their products, even after they knew or

15   should have known of the unreasonable risks from use or exposure; and concealed, downplayed,

16   or otherwise suppressed, through aggressive marketing and promotion, any information or

17   research about the risks and dangers of exposure to Toxic Heavy Metals from consumption of

18   Contaminated Baby Foods.

19       111.    This alleged failure to warn is not limited to the information contained on

20   Contaminated Baby Foods labeling.  The Defendants were able, in accord with federal law, to

21   comply with relevant state law by disclosing the known risks associated with exposure to Heavy

22   Metals in Contaminated Baby Foods through other non-labeling mediums, i.e., promotion,

23   advertisements, public service announcements, and/or public information sources.   But the

24   Defendants did not disclose these known risks through any medium. The ability to provide such

25   warnings is not prohibited by any federal law.

26       112.    Furthermore, Defendants possess a First Amendment Right to make truthful

27   statements about the products they sell, and no law could lawfully restrict that constitutional right.

28   This included making statements about the presence of and risks associated with Toxic Heavy

1    Metals in Contaminated Baby Foods.

2        113.    Had Defendants provided adequate warnings and instructions and properly

3    disclosed and disseminated the risks associated with exposure to the toxins in their Contaminated

4    Baby Foods, Plaintiffs could have avoided the risk of developing injuries and could have obtained

5    or used alternative products.  However, as a result of Defendants' concealment of the dangers

6    posed by the Toxic Heavy Metals in their Contaminated Baby Foods, Plaintiff could not have

7    averted their exposures.

8        114.    Defendants' conduct, as described above, was reckless.  Defendants risked the

9    lives of babies and children, including Plaintiff, with knowledge of the safety problems associated

10   with Contaminated Baby Foods, and suppressed this knowledge from the general public.

11   Defendants made conscious decisions not to warn or inform the unsuspecting public.

12       115.    The Defendants' lack of adequate warnings and instructions accompanying their

13   Contaminated Baby Foods caused Plaintiff's injuries.

14       116.    As a direct and proximate result of the Defendants' failure to provide an adequate

15   warning of the risks of exposure to the Toxic Heavy Metals in their Contaminated Baby Foods,

16   Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment,

17   loss of enjoyment of life, economic loss and damages including, but not limited to past and future

18   medical expenses, lost income, and other damages.

19       117.    **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in

20   Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all

21   such other and further relief as this Court deems just and proper.

22       **COUNT II: STRICT PRODUCTS LIABILITY – MANUFACTURING DEFECT**

23       118.    Plaintiff incorporates by reference each allegation set forth in preceding

24   paragraphs as if fully stated herein.

25       119.    At all times herein mentioned, Defendants designed, manufactured, tested,

26   marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiff.

27       120.    At all relevant times, the Contaminated Baby Foods consumed by Plaintiff were

28   expected to and did reach Plaintiff without a substantial change in their condition as

- 30 -

1    manufactured, handled, distributed, and sold by Defendants.

2        121.    At all relevant times, the Contaminated Baby Foods consumed by Plaintiff were

3    used in a manner that was foreseeable and intended by Defendants.

4        122.    The Contaminated Baby Foods consumed by Plaintiff were not reasonably safe

5    for their intended use and were defective with respect to their manufacture, as described herein,

6    in that Defendants deviated materially from their design and manufacturing specifications and/or

7    such design and manufacture posed an unreasonable risk of harm to Plaintiffs.[1]  Baby food should

8    not, by design, contain any detectable levels of Toxic Heavy Metals in them.  Thus, Defendants'

9    Contaminated Baby Foods contain manufacturing defects.

10       123.    The Defendants' Contaminated Baby Foods contained Toxic Heavy Metals

11   because, while in the control and possession of Defendants, they manufactured ingredients and

12   used manufacturing processes that result in the finished product being contaminated with Toxic

13   Heavy Metals.  Had Defendants properly manufactured (directly or through co-manufacturers)

14   the baby foods, they would not have contained detectable levels of Toxic Heavy Metals in them

15   and, thus, would not have contained a manufacturing defect.

16       124.    Nothing under federal law limited or restricted Defendants from taking action to

17   reduce or eliminate the Toxic Heavy Metals from being present in their baby foods.

18       125.     This manufacturing defect caused Plaintiff to be exposed to Toxic Heavy Metals

19   through ingestion of the Contaminated Baby Foods which, in turn, caused neurodevelopmental

20   harm that manifested as ASD and/or ADHD.

21       126.    The exposure to the Toxic Heavy Metals in the Contaminated Baby Foods creates

22   risks to the health and safety of babies that are far more significant than the risks posed by non-

23   Contaminated Baby Food products, and which far outweigh the utility of the Contaminated Baby

24   Foods products because of Defendants' manufacturing defects.

25       127.    Defendants have intentionally and recklessly manufactured the Contaminated

26   Baby Foods with wanton and willful disregard for the rights and health of Plaintiff, and with

27   ───────────────────

28   [1] If, through discovery and further litigation, it is discovered that Defendants' baby food
     products contained detectable levels of Toxic Heavy Metals by design, then Plaintiff will
     pursue a design defect claim (Count III) in the alternative.

1  malice, placing their economic interests above the health and safety of Plaintiff.

2      128.    As a direct and proximate result of the Defendants' defective manufacture of the

3  Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain,

4  suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including,

5  but not limited to medical expenses, lost income, and other damages.

6      129.    **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in

7  Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all

8  such other and further relief as this Court deems just and proper.

9      **COUNT III:  STRICT PRODUCTS LIABILITY – DESIGN DEFECT**

10      130.    Plaintiff incorporates by reference each allegation set forth in preceding

11  paragraphs as if fully stated herein.

12      131.    At all times herein mentioned, Defendants designed, manufactured, tested,

13  marketed, sold, handled, and distributed the Contaminated Baby Foods consumed by Plaintiff.

14  These actions were under the ultimate control and supervision of Defendants.

15      132.    At all relevant times, Defendants' Baby Food products were designed and labeled

16  in an unsafe, defective, and inherently dangerous manner that was dangerous for use or

17  consumption by infants and babies, including Plaintiff.

18      133.    Defendants' Contaminated Baby Food products as researched, tested, developed,

19  designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by

20  Defendants were defective in design and formulation in that, when they were placed into the

21  stream of commerce, they were unreasonably dangerous and dangerous to an extent beyond that

22  which an ordinary consumer would contemplate.

23      134.    Defendants' Contaminated Baby Food products, as researched, tested, developed,

24  designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by

25  Defendants were defective in design and formulation in that, when they left the hands of

26  Defendants, the foreseeable risks exceeded the alleged benefits associated with their design and

27  formulation.

28      135.    At all relevant times, the Contaminated Baby Food products consumed by Plaintiff

- 32 -

1    were expected to and did reach Plaintiff without a substantial change in its condition as designed,

2    manufactured, handled, distributed, and sold by Defendants.

3       136.    At all relevant times, Defendants knew or had reason to know that their

4    Contaminated Baby Food products were defective and were inherently dangerous and unsafe

5    when used in the manner instructed and provided by Defendants.

6       137.    Therefore, at all relevant times, Defendants' Baby Food products, as researched,

7    tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed,

8    sold and marketed by Defendants were defective in design and formulation, in one or more of the

9    following ways:

10       A.    When placed in the stream of commerce, Defendants' Contaminated Baby

11   Food products were unreasonably dangerous in that they contained Toxic Heavy Metals that

12   posed a risk of causing interference with neurodevelopment in babies that manifests as the

13   neurodevelopmental disorders ASD, ADHD and related *sequalae* when used in a reasonably

14   anticipated manner;

15       B.    When placed in the stream of commerce, Defendants' designed

16   Contaminated Baby Food products to contain unreasonably dangerous design defects and were

17   not reasonably safe when used in a reasonably anticipated or intended manner;

18       C.    Defendants, by design, did not sufficiently test, investigate, or study their

19   Contaminated Baby Food products;

20       D.    Exposure to the Toxic Heavy Metals in Defendants' Contaminated Baby

21   Food products present a risk of harmful effects that outweigh any potential utility stemming from

22   their use;

23       E.    Defendants, by design, did not conduct adequate post-marketing

24   surveillance of their Contaminated Baby Food products which would have alerted the public to

25   risks; and

26       F.    Defendants could have employed safer alternative designs and

27   formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any

28   detectable level of Toxic Heavy Metals.

138.    Plaintiff consumed Defendants' Contaminated Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

139.    Defendants' Contaminated Baby Food products were and are more dangerous than alternative products, and Defendants could have designed their Contaminated Baby Food products to avoid harm to children.  Indeed, at the time Defendants designed the Contaminated Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

140.    At the time the Contaminated Baby Food products left Defendants' control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby Foods.

141.    Defendants intentionally and recklessly defectively designed the Contaminated Baby Foods with wanton and willful disregard for the rights and health of Plaintiff, and with malice, placing their economic interests above the health and safety of Plaintiff.

142.    The design defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiff's injuries.

143.    As a direct and proximate result of the Defendants' defective design of the Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

144.    **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT IV: NEGLIGENCE – FAILURE TO WARN

145.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

146.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting baby foods. Defendants

- 34 -

knew, or, by the exercise of reasonable care, should have known that their Contaminated Baby Foods are not accompanied with adequate warnings concerning the dangerous characteristics of exposure to Toxic Heavy Metals from consumption. These actions were under the ultimate control and supervision of Defendants.

147.   Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Contaminated Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiff, and therefore had a duty to warn of the risks associated with the presence of and exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

148.   At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Contaminated Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn Plaintiff of dangers associated with the presence of and exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.  Defendants, as a manufacturer, seller, or distributor of food products, are held to the knowledge of an expert in the field.

149.   At the time of manufacture, Defendants could have provided warnings regarding the presence of and risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods because they knew or should have known exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods was dangerous, harmful and injurious when the Contaminated Baby Foods were consumed by Plaintiff in a reasonably foreseeable manner.

150.   At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their products and to those who would foreseeably use or be harmed by Defendants' Contaminated Baby Foods.

151.   Defendants knew or should have known that exposure to Toxic Heavy Metals from

consumption of Contaminated Baby Foods posed a risk of harm, but failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the toxins in the products. The dangerous propensities of exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, or sold the products, and were not known to end users and consumers, such as Plaintiff.

152.     At all relevant times, Plaintiff was exposed to Toxic Heavy Metals through consumption of the Contaminated Baby Foods while using the products for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

153.     Defendants knew or should have known that the non-extant warnings disseminated with their Contaminated Baby Foods were inadequate, failed to communicate adequate information on the presence of and dangers of exposure to toxins contained therein, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

154.     The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid using the product and, in turn, prevented exposure to the Toxic Heavy Metals contained therein. Instead, Defendants disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to the Toxic Heavy Metals in the Contaminated Baby Foods; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure to the toxins contained therein; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Toxic Heavy Metals from consumption of the Contaminated Baby Foods.

155.     A reasonable company under the same or similar circumstance would have warned and instructed of the dangers of exposure to Toxic Heavy Metals from consumption of

1   Contaminated Baby Foods.

2       156.    This alleged failure to warn is not limited to the information contained on the

3   labeling of Defendants' Contaminated Baby Foods. Defendants were able, in accord with federal

4   law, to comply with relevant state law by disclosing the known risks associated with exposure to

5   Toxic Heavy Metals from consumption of Contaminated Baby Foods through other non-labeling

6   mediums, i.e., promotion, advertisements, public service announcements, and/or public

7   information sources. But the Defendants did not disclose these known risks through any medium.

8       157.    Furthermore, Defendants possess a First Amendment Right to make truthful

9   statements about the products they sell, and no law could lawfully restrict that constitutional right.

10      158.    Had Defendants provided adequate warnings and instructions and properly

11   disclosed and disseminated the risks associated with the presence of and exposure to Toxic Heavy

12   Metals in the Contaminated Baby Foods, Plaintiff could have avoided the risk of developing

13   injuries and could have obtained or used alternative products.  However, as a result of Defendants'

14   concealment of the dangers posed by their Contaminated Baby Foods, Plaintiff could not have

15   averted their injuries.

16      159.    Defendants' conduct, as described above, was reckless. Defendants risked the

17   lives of consumers and users of their products, including Plaintiff, with knowledge of the safety

18   problems associated with Contaminated Baby Foods, and suppressed this knowledge from the

19   general public.  Defendants made conscious decisions not to warn or inform the unsuspecting

20   public.

21      160.    The Defendants' lack of adequate warnings and instructions accompanying their

22   Contaminated Baby Foods were a substantial factor in causing Plaintiff's injuries.

23      161.    As a direct and proximate result of the Defendants' failure to provide an adequate

24   warning of the risks of exposure to Toxic Heavy Metals from consumption of Contaminated Baby

25   Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability,

26   impairment, loss of enjoyment of life, economic loss and damages including, but not limited to

27   past and future medical expenses, lost income, and other damages.

28      162.    **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in

1   Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all

2   such other and further relief as this Court deems just and proper.

3   **COUNT V:  NEGLIGENCE – MANUFACTURING**

4   163.   Plaintiff incorporates by reference each allegation set forth in preceding

5   paragraphs as if fully stated herein.

6   164.   At all relevant times, the Defendants manufactured, tested, marketed, sold, and

7   distributed the Contaminated Baby Foods that Plaintiff consumed.

8   165.   The Defendants had a duty to exercise reasonable care, in the manufacturing,

9   testing, marketing, sale, and distribution of baby foods.

10   166.   The Defendants knew or, by the exercise of reasonable care, should have known,

11   that exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods rendered

12   the foods carelessly manufactured, dangerous, harmful and injurious when used by Plaintiff in a

13   reasonably foreseeable manner.

14   167.   The Defendants knew or, by the exercise of reasonable care, should have known,

15   ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

16   exposure to Toxic Heavy Metals from consumption of Contaminated Baby Foods.

17   168.   Without limitation, examples of the manner in which Defendants breached their

18   duty to exercise reasonable care in manufacturing Contaminated Baby Foods, included:

19   **A.**   Failure to adequately inspect/test the Contaminated Baby Foods, and their

20   ingredients, during and after the manufacturing process;

21   **B.**   Failure to implement procedures that would reduce or eliminate Toxic

22   Heavy Metals in baby foods;

23   **C.**   Failure to investigate suppliers and ingredient sources to reduce and

24   eliminate the risk of ingredients containing Toxic Heavy Metals; and

25   **D.**   Failure to avoid using ingredients free from, or which contain far less,

26   Toxic Heavy Metals to manufacture baby food.

27   169.   A reasonable manufacturer under the same or similar circumstances would have

28   implemented appropriate manufacturing procedures to better ensure the quality and safety of their

- 38 -

product.

170.     Plaintiff was harmed directly and proximately by the Defendants' failure to use reasonable care in the manufacture of their Contaminated Baby Foods.  Such harm includes exposure to Toxic Heavy Metals, which can cause or contribute to interference with early neurodevelopment which manifests as ASD and related *sequalae*.

171.     Defendants' improper manufacturing of Baby Foods was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Contaminated Baby Foods, including Plaintiff.

172.     The defects in Defendants' Contaminated Baby Foods were substantial factors in causing Plaintiff's injuries.

173.     As a direct and proximate result of the Defendants' improper manufacturing of Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

174.     **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

### COUNT VI:  NEGLIGENCE – PRODUCT DESIGN

175.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

176.     Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Contaminated Baby Foods.

177.     The Defendants owed a duty to all reasonably foreseeable users to design a safe product.

178.     The Defendants breached their duty by failing to use reasonable care in the design of Contaminated Baby Foods because the products exposed babies to Toxic Heavy Metals.

179.     The Defendants breached their duty by failing to use reasonable care in the design

- 39 -

1  of Contaminated Baby Foods by negligently designing the foods with ingredients and/or

2  components contaminated with Toxic Heavy Metals.

3      180.    The Defendants breached their duty by failing to use reasonable care in the design

4  of Contaminated Baby Foods by negligently designing and formulation, in one or more of the

5  following ways:

6      **A.**    When placed in the stream of commerce, Defendants' Contaminated Baby

7  Foods were defective in design and formulation, and, consequently, dangerous to an extent

8  beyond that which an ordinary consumer would contemplate;

9      **B.**    When placed in the stream of commerce, Defendants' Contaminated Baby

10  Foods were unreasonably dangerous in that they were hazardous and posed a risk of

11  neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated

12  manner;

13      **C.**    When placed in the stream of commerce, Defendants' Contaminated Baby

14  Foods contained unreasonably dangerous design defects and were not reasonably safe when used

15  in a reasonably anticipated or intended manner;

16      **D.**    Defendants did not sufficiently test, investigate, or study their

17  Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients

18  used to manufacture the foods and/or the finished products;

19      **E.**    Defendants did not sufficiently test, investigate, or study their

20  Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic

21  Heavy Metals; and

22      **F.**    Exposure to the Toxic Heavy Metals in Contaminated Baby Foods presents

23  a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

24      181.    Defendants knew or should have known at the time of marketing Contaminated

25  Baby Foods that exposure to Toxic Heavy Metals contained in the Baby Foods could result in

26  interference with early neurodevelopment that that manifests as ASD, ADHD and other severe

27  illnesses and injuries.

28      182.    Defendants, by design, did not conduct adequate post-marketing surveillance of

1    their Contaminated Baby Foods.

2        183.    Defendants could have employed safer alternative designs and formulations.  For

3    example, the Defendants could have avoided use of certain ingredients contaminated with Toxic

4    Heavy Metals, avoided using pre-mix vitamins contaminated with Toxic Heavy Metals, and/or

5    sampled their ingredients from other sources.

6        184.    The Defendants breached their duty by failing to use reasonable care by failing to

7    use cost effective, reasonably feasible alternative designs.  There was a practical, technically

8    feasible, and safer alternative design that would have prevented the harm without substantially

9    impairing the reasonably anticipated or intended function of Defendants' Contaminated Baby

10   Foods.

11       185.    A reasonable company under the same or similar circumstances would have

12   designed a safer product.

13       186.    Plaintiff was harmed directly and proximately by the Defendants' failure to use

14   reasonable care in the design of their Contaminated Baby Foods.  Such harm includes exposure

15   to Toxic Heavy Metals, which can cause or contribute to interference with neurodevelopment that

16   manifests as ASD and related *sequalae*.

17       187.    Defendants' defective design of Contaminated Baby Foods was willful, wanton,

18   malicious, and conducted with reckless disregard for the health and safety of consumers of the

19   Baby Foods, including Plaintiff.

20       188.    The defects in Defendants' Contaminated Baby Foods were substantial factors in

21   causing Plaintiff's injuries.

22       189.    As a direct and proximate result of the Defendants' negligent design of the

23   Contaminated Baby Foods, Plaintiff has been injured, sustained severe and permanent pain,

24   suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including,

25   but not limited to past and future medical expenses, lost income, and other damages.

26       190.    **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in

27   Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all

28   such other and further relief as this Court deems just and proper.

**COUNT VII:  GENERAL NEGLIGENCE**

191.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

192.    Plaintiff pleads claims for negligence under all theories that may be actionable under any applicable state laws.

193.    Defendants owed Plaintiff a duty to act with reasonable care.

A.    Defendants owed a duty because they distributed and promoted their products as safe for children to consume.

B.    Defendants owed a duty because their conduct created a risk of harm to Plaintiffs and caused Plaintiff actual harm.

C.    Defendants owed a duty because the risk of harm to Plaintiff was embedded in, and an inherent component of, their negligent business practices.

D.    Defendants owed a duty because they designed, manufactured, controlled, distributed, and sold their products to Plaintiff.

194.    Defendants breached their duty to Plaintiff.

195.    Defendants' negligence includes, but is not limited to, their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Contaminated Baby Foods in one or more of the following respects:

A.    Failure to implement procedures that would reduce or eliminate Toxic Heavy Metals in baby foods;

B.    Failure to investigate suppliers and ingredient sources to reduce and eliminate the risk of ingredients containing Toxic Heavy Metals; and

C.    Failure to avoid using ingredients free from, or which contain far less, Toxic Heavy Metals to manufacture baby food.

D.    When placed in the stream of commerce, Defendants' Contaminated Baby Foods were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

E.    When placed in the stream of commerce, Defendants' Contaminated Baby

1   Foods were unreasonably dangerous in that they were hazardous and posed a risk of
2   neurodevelopmental disorders and other serious illnesses when used in a reasonably anticipated
3   manner;

4       **F.**    When placed in the stream of commerce, Defendants' Contaminated Baby
5   Foods contained unreasonably dangerous design defects and were not reasonably safe when used
6   in a reasonably anticipated or intended manner;

7       **G.**    Defendants, by design, did not conduct adequate post-marketing
8   surveillance of their Contaminated Baby Food products which would have alerted the public to
9   risks; and

10      **H.**    Defendants did not sufficiently test, investigate, or study their
11  Contaminated Baby Foods and, specifically, the ability for those foods to expose babies to Toxic
12  Heavy Metals;

13      **I.**    Defendants could have employed safer alternative designs and
14  formulations for Contaminated Baby Foods, such as ensuring the baby food did not have any
15  detectable level of Toxic Heavy Metal.

16      **J.**    Defendants did not sufficiently test, investigate, or study their
17  Contaminated Baby Foods and, specifically, the content of Toxic Heavy Metals in the ingredients
18  used to manufacture the foods and/or the finished products; and

19      **K.**    Exposure to the Toxic Heavy Metals in Contaminated Baby Foods presents
20  a risk of harmful effects that outweigh any potential utility stemming from the use of the products;

21      196.    Defendants knew or should have known that their products contained detectable
22  levels of heavy metals that created an unreasonable risk of harm to children who consumed their
23  products.

24      197.    At all relevant times, the Defendants knew or should have known that the Products
25  were unreasonably dangerous and defective when put to their reasonably anticipated use.

26      198.    As a proximate result of Defendants' negligence, Plaintiff has been injured,
27  sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life,
28  economic loss, and damages including, but not limited to past and future medical expenses, lost

1   income, and other damages.

2       199.   **WHEREFORE**, Plaintiff respectfully requests this Court enter judgment in

3   Plaintiff's favor for damages, together with interest, costs herein incurred, attorneys' fees and all

4   such other and further relief as this Court deems just and proper.

5

6                        **JURY TRIAL DEMAND**

7       200.   Plaintiff demands a trial by jury on all the triable issues within this pleading.

8                        **PRAYER FOR RELIEF**

9       201.   WHEREFORE, Plaintiff requests that the Court enter judgment in Plaintiff's favor

10   and against the Defendants for:

11            a.   actual or compensatory damages in such amount to be determined at trial and

12               as provided by applicable law;

13            b.   exemplary and punitive damages sufficient to punish and deter the Defendants

14               and others from future wrongful practices;

15            c.   pre-judgment and post-judgment interest;

16            d.   costs including reasonable attorneys' fees, court costs, and other litigation

17               expenses; and

18            e.   any other relief the Court may deem just and proper.

19   Respectfully submitted,                 **ANAPOL WEISS**

20

21                                */s/ William L. Smith*
                               WILLIAM L. SMITH

22                             Cal. State Bar No. 324235
                             ALEXANDRA M. WALSH(admitted *Pro Hac Vice)*

23                             DC Bar No. 490484
                             HOLLY DOLEJSI(*Pro Hac Vice* pending)

24                             MN State Bar No. 0390110
                             One Logan Square

25                             130 North 18th St., Suite 1600
                             Philadelphia, PA 19103

26                             Telephone: 202.780.3014
                             Facsimile: 215.875.7723

27                             Email: wsmith@anapolweiss.com
                             Email: awalsh@anapolweiss.com

28                             Email: hdolejsi@anapolweiss.com

- 44 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Aimee H. Wagstaff (Admitted *Pro Hac Vice*)
**WAGSTAFF LAW FIRM**
940 N Lincoln St.
Denver, CO 80203
Tel: (720) 208-9402
Email: awagstaff@wagstafflawfirm.com

*Attorneys for Plaintiff*

- 45 -